# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| ALAN VERDECCHIA,<br>    Plaintiff,<br><br>    v.<br><br>DAVID DECESARE, *individually and in his capacity as Chief of the Rhode Island Division of Sheriffs*; R.I. DEPARTMENT OF ADMINISTRATION; THE STATE OF RHODE ISLAND, *by and through its Treasurer, SETH MAGAZINER*; and JOHN DOE/JANE DOE DEFENDANTS, 1-5, *Unnamed current or former employees of the STATE OF RHODE ISLAND*,<br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>C.A. No. 21-cv-269-JJM-AEM |

## MEMORANDUM AND ORDER.

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

Alan Verdecchia alleges violations of his: (1) Substantive Due Process rights; (2) Equal Protection rights; and (3) rights under the Age Discrimination in Employment Act, 29 U.S.C. § 621-634 ("ADEA") during his employment with the Rhode Island Division of Sheriffs. ECF No. 1. Defendants Chief David DeCesare, the Rhode Island Department of Administration ("DOA"), and the State of Rhode Island ("the State") move for summary judgment on all claims.[1] For the reasons

---

[1] Defendants had moved for summary judgment, *see* ECF No. 43, but the Court dismissed that motion without prejudice to reopen discovery for sixty days and ordered the parties to file new dispositive motions within thirty days after the close of that discovery period. Minute Entry (Feb. 4, 2025).

stated below, the Court GRANTS Defendants' Motion for Summary Judgment. ECF No. 70.

## I.    BACKGROUND

Mr. Verdecchia worked with the Rhode Island Division of Sheriffs (formerly known as the Rhode Island State Marshals) for 36 years, from 1987 to 2021. *See* ECF No. 71 ¶¶ 12, 43. During his tenure, a series of promotions ultimately led him to assume the position of Deputy Sheriff Lieutenant in 2013. *Id.* ¶ 14.

A few years later, Mr. Verdecchia was involved in an incident where a prisoner was erroneously released from custody. *Id.* ¶ 15. In that incident, a probation officer contacted Mr. Verdecchia, notifying him of the potential erroneous release of a prisoner. *Id.*; ECF No. 71-19. Thereafter, Mr. Verdecchia confirmed the erroneous release and contacted Captain Raymond Moore—with both deciding to conduct an internal investigation to try to apprehend the prisoner without notifying the Division of Sheriffs Command Staff. *Id.* Finally, after two days of unsuccessful efforts to apprehend the prisoner, Command Staff was finally notified of the erroneous release. *Id.*

Mr. Verdecchia submitted to discipline because of the incident—a demotion to Deputy Sheriff Sergeant—after signing a special demotion agreement ("2015 SPA") with the DOA and his union, AFSCME Council 94/Local 2409. *Id.* ¶ 15. Mr. Verdecchia read and signed the 2015 SPA with the assistance of counsel. *Id.* ¶ 19. Apart from constituting an agreement to the demotion, Mr. Verdecchia's signing of the 2015 SPA also waived his right to challenge or contest the agreement

in state or federal court for all claims arising under state or federal labor and/or employment law. *Id.* ¶ 17. The parties also stipulated and agreed that "the provisions of [the 2015 SPA] are entered into voluntarily and that none of the Parties have been coerced to enter into this Agreement through fraud, duress, misrepresentation, undue influence, or any other means that may affect the voluntariness of the mutual assent upon which this Agreement is based." *Id.* ¶ 18.

About five years later, Mr. Verdecchia was subjected to more disciplinary actions. He received a pre-disciplinary hearing letter, indicating that he violated the Rhode Island Division of Sheriffs' taser policy and demonstrated a continued unwillingness or inability to perform assigned tasks including filing accurate attendance records ("IMC records") and/or resistance reports. *Id.* ¶ 20. After the hearing on those alleged infractions, Mr. Verdecchia signed a special purpose agreement ("2020 SPA") with the DOA and his union, agreeing to a 15-day suspension because of those infractions and the same waiver of rights to challenge the agreement found in the 2015 SPA. *Id.* ¶¶ 20-22. The parties also stipulated and agreed that the terms of the 2020 SPA were entered into voluntarily—without "fraud, duress, misrepresentation, undue influence . . . ." *Id.* ¶ 22. As with the 2015 SPA, Mr. Verdecchia read and signed the 2020 SPA with the assistance of counsel. *Id.* ¶ 23.

At the beginning of the next year, Deputy Sheriff John Pena, who Mr. Verdecchia supervised, violated the Department of Sheriffs' December 2020 COVID-19 Directive ("Directive") when he turned away a police officer who was transporting a prisoner to the Noel Judicial Complex. *Id.* ¶ 28. Mr. Verdecchia

admitted that it was a "complete oversight on [his] behalf" regarding the Directive and upon review of the Directive, he understood that he should have accepted the prisoner once he conferred with Deputy Pena. *Id.* Because of this incident, Mr. Verdecchia was issued a pre-disciplinary letter for his failure to: (1) "notify [his] subordinates of the [Directive], which led to an inmate being erroneously turned away from the Noel Complex," and (2) "take the appropriate action upon learning that an inmate had been refused entry into the Noel Judicial Complex." *Id.* ¶ 30.

A week after receiving the letter, Mr. Verdecchia attended a pre-disciplinary meeting with his counsel and Human Resources Investigator, Clara McNulty. *Id.* ¶ 31. There, the DOA told his attorney that because Mr. Verdecchia had significant discipline on his record—the suspension and demotion—the DOA had to consider that record and apply progressive discipline. *Id.* ¶ 33. Ultimately, Ms. McNulty informed Mr. Verdecchia's attorney that the State planned to pursue a demotion for Mr. Verdecchia because it felt that he was not "management material" and a demotion to a deputy position would be appropriate for him. *Id.* ¶ 36. On the other hand, Mr. Verdecchia's supervisor, Lieutenant Karen Dellinger, received an oral reprimand for the COVID-19 Directive violations. *Id.* ¶ 34.

After consulting his attorney, Mr. Verdecchia retired. *Id.* ¶ 38. Mr. Verdecchia's attorney told him that if he were going to submit his retirement papers, the State would not pursue another demotion. *Id.* ¶ 39. A few days later, Mr. Verdecchia submitted his request to retire, retaining his position as Deputy Sheriff

Sergeant until his retirement on March 28, 2021. *Id.* ¶ 43. A few months later, Mr. Verdecchia filed this suit. *See* ECF No. 1.

## II.    STANDARD OF REVIEW

A party is entitled to summary judgment if the movant shows there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A party can show a genuine dispute by citing to materials in the record, including "depositions, documents, electronically stored information, affidavits or declarations, stipulations ... admissions, interrogatory answers, or other materials," or by showing that the materials cited either do not establish a genuine dispute or are not supported by admissible evidence. *Id.* Summary judgment is mandated against a party who, given adequate time for discovery, "fails to make a showing sufficient to establish the existence of an element essential to that party's case ... on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A complete failure of proof of an essential element shows that there is "no genuine issue as to any material fact" because if one element fails, all other facts are rendered irrelevant; it entitles the moving party to "judgment as a matter of law" because, by definition, the nonmoving party cannot carry their burden at trial. *Id.* at 323.

## III.    DISCUSSION

### A.    Section 1983 Claims

**Against the State Defendants and Defendant DeCesare, in His Official Capacity.**

In Counts I, II, and IV of his Complaint, Mr. Verdecchia alleges claims arising under 42 U.S.C. § 1983 against the State, the DOA, and Chief DeCesare in his individual and official capacities.  Section 1983 provides that:

> *Every person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…

*See* 42 U.S.C. § 1983 (emphasis added).  But Defendants cite *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) to argue that his damages claims against the State, the DOA, and Chief DeCesare in his official capacity are barred because state actors cannot be liable for damages in a § 1983 action.  The Court agrees.

In *Will*, the Supreme Court held that "neither a State nor its officials acting in their official capacities are "persons" under § 1983." 491 U.S. at 71.  Thus, "neither a state agency nor a state official acting in his official capacity may be sued for *damages* in a section 1983 action." *Johnson v. Rodriguez*, 943 F.2d 104, 108 (1st Cir. 1991) (emphasis added).[2]  Here, Mr. Verdecchia seeks only monetary damages as relief. *See*

---

[2] To be clear, "a state official in his or her official capacity, when sued for *injunctive relief*, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State." *Will*, 491 U.S. at 71 n.10 (emphasis added).

ECF No. 1 at 19. Thus, Mr. Verdecchia's claims under § 1983 (Counts I, II, and IV) against the State, the DOA, and Chief DeCesare in his official capacity are barred because they are not "persons" under that section.[3] *See Will*, 491 U.S. at 71. Accordingly, the Court GRANTS the State, the DOA, and Chief DeCesare's—in his official capacity—Motion for Summary Judgment on Counts I, II, and IV.

**Against Defendant DeCesare, in His Individual Capacity.**

Mr. Verdecchia's remaining § 1983 claims are his Fourteenth Amendment Equal Protection and Substantive Due Process claims against Chief DeCesare in his individual capacity.

### i.  Equal Protection Claims

Mr. Verdecchia pursues two types of equal protection claims: a "class of one" claim and a selective treatment claim. The Court will address each in turn.

#### a) *Class of one*

To raise a successful class of one claim, a plaintiff must establish that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). But the Supreme Court has held that "the class-of-one theory

---

[3] Because the State, the DOA, and Chief DeCesare in his official capacity are not "persons" under § 1983, Mr. Verdecchia's attempt to assert a § 1983 claim pursuant to Article I, Section 2 of the Rhode Island Constitution also fails. *See* ECF No. 50 at 18. To the extent that Mr. Verdecchia asserts a standalone claim for money damages under Article I, Section 2 of the Rhode Island Constitution, that claim fails as well because that provision does not give rise to a private cause of action. *See Kurland v. City of Providence by & through Lombardi*, 711 F. Supp. 3d 57, 77 (D.R.I. 2024); *Doe v. Brown Univ.*, 253 A.3d 389, 401 (R.I. 2021).

of equal protection has no application in the public employment context." *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 607 (2008). That said, Mr. Verdecchia argues that the *Engquist* decision does not apply here because its holding was limited to *at-will* public employment, and he was not an at-will public employee. ECF No. 50 at 21.

Mr. Verdecchia's reading of the outcome of *Engquist* as limited to the at-will employment paradigm is impermissibly narrow. It is true that in explaining why the class of one claim did not apply to public employment, the *Engquist* court noted that government employment was traditionally at-will, *Engquist* 553 U.S. at 606, but it then acknowledged that state and federal legislatures have "for the most part, replaced at-will employment with various statutory schemes protecting public employees from discharge for impermissible reasons. *Id.* at 606–07.

> To treat employees differently is not to classify them in a way that raises equal protection concerns. Rather, it is simply to exercise the broad discretion that typically characterizes the employer-employee relationship. A challenge that one has been treated individually in this context, instead of like everyone else, is a challenge to the underlying nature of the government action

*Id.* at 605.[4]

The Court finds that *Engquist* is not limited to cases involving at-will public employment and thus applies to Mr. Verdecchia's class of one claim made in the

---

[4] "Of course, that is not to say that the Equal Protection Clause, like other constitutional provisions, does not apply to public employers. Indeed, our cases make clear that the Equal Protection Clause is implicated when the government makes class-based decisions in the employment context, treating distinct groups of individuals categorically differently." *Engquist*, 553 U.S. at 605.

public employment context.[5]  Therefore, his class of one Equal Protection claim fails as a matter of law and the Court GRANTS Defendants' Motion for Summary Judgment on that claim.

### b) Selective treatment

Next, the Court considers Mr. Verdecchia's selective treatment claim.  He asserts that Chief DeCesare selectively enforced the Division of Sheriffs' rules and regulations against him with malicious or bad faith intent to injure him.  "To establish a claim of selective treatment, a plaintiff must show that (1) the plaintiff, 'compared with others similarly situated, ... was selectively treated'; and (2) such selective treatment was 'based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'"  *McCoy v. Town of Pittsfield, NH*, 59 F.4th 497, 508 (1st Cir. 2023) (quoting *Barrington Cove Ltd. v. R. I. Hous. & Mortg. Fin. Corp.*, 246 F.3d 1, 7 (1st Cir. 2001)).

---

[5] Mr. Verdecchia argues that the district court's decision in *Testa v. Salvatore Mancini Res. & Activity Ctr., Inc.* reasons that the Supreme Court's *Engquist* decision did not bar a public employee from asserting a class of one claim against a government employer.  ECF No. 50 at 21.  But a review of that case does not reflect such a holding.  Rather, the *Testa* court determined that the *Engquist* decision did not apply to plaintiff's "class of one" claim because the claim did "not involve public employment decision-making." *Testa v. Salvatore Mancini Res. & Activity Ctr., Inc.*, C.A. No. 18-566-WES, 2019 WL 2929333, at *3 (D.R.I. July 8, 2019), *report and recommendation adopted*, C.A. No. 18-cv-566-MSM-LDA, 2020 WL 91554 (D.R.I. Jan. 8, 2020).  Thus, the *Testa* case is not helpful here because Mr. Verdecchia's class of one claim does involve "public employment decision making"—particularly the Defendants' decisions on what disciplinary action they should take in response to a policy violation.

"The determination as to whether individuals are 'similarly situated' for equal protection purposes is an amorphous one. 'The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated . . . Exact correlation is neither likely nor necessary . . . .'" *Tapalian v. Tusino*, 377 F.3d 1, 6 (1st Cir. 2004) (quoting *Barrington Cove*, 246 F.3d at 8 (citation omitted)). "[T]he 'relevant aspects' are those factual elements which determine whether reasoned analogy supports, or demands, a like result." *Aponte-Ramos v. Álvarez-Rubio*, 783 F.3d 905, 909 (1st Cir. 2015) (citation omitted).

Beginning with Mr. Verdecchia's involvement in an incident where a prisoner was erroneously released from custody, he alleges that other officers were involved in other erroneous prisoner release incidents but who were not disciplined. *See* ECF No. 50-3 ¶¶ 67-69. Citing only to his deposition testimony, he contends that (1) "Sergeant Russell Icart was involved in four erroneous releases and never received discipline for any of the four"; (2) "Deputy Sheriff Paul Clays allowed a prisoner to escape from a hospital but was not disciplined because [Captain] Chris Reilly 'squashed it'"; and (3) "Sergeant Robert Sasso erroneously released a prisoner who had charges of attempted murder pending against him and did not notify command staff for two days, yet received no discipline." *Id.*

First, Mr. Verdecchia does not outline any specific facts as to Sergeant Icart's alleged involvement in the four erroneous prisoner release incidents and thus fails to present sufficient evidence to allow a reasonable factfinder to determine whether he and Sergeant Icart were similarly situated. As to Deputy Sheriff Clays,

10

Mr. Verdecchia's testimony suggests that Captain Reilly—not Chief DeCesare—was responsible for the lack of disciplinary action against Deputy Sheriff Clay for his alleged involvement in an erroneous release. Lastly, Mr. Verdecchia's description of the erroneous prisoner release incident that Sergeant Sasso was involved in is not supported by the deposition testimony he cites. Mr. Verdecchia testified that he did not know whether Sergeant Sasso failed to notify command staff for two days after the prisoner was released by mistake.[6] *See* ECF No. 50-1 at 51-52. Rather, Mr. Verdecchia testified that, under Sergeant Sasso's watch, a prisoner was erroneously released but later brought back to the courthouse by their attorney. *Id.*

Mr. Verdecchia has not illustrated that any of these sheriffs engaged in conduct that was the same level of seriousness as the conduct he engaged in during his erroneous prisoner release incident. As to all those sheriffs' incidents, Mr. Verdecchia testified that he had no knowledge as to whether any of them attempted to apprehend the erroneously released prisoners on their own for two days before notifying command staff, like Mr. Verdecchia did. *Id.* While "exact correlation" is not required for illustrating whether those sheriffs were similarly situated, merely asserting that these officers were involved in erroneous prisoner release incidents—without any facts illustrating a comparable level of culpability or serious misconduct—is not

---

[6] Q: To your knowledge, did Sergeant Sasso attempt to apprehend the individual on his own or in conjunction with anyone else prior, for two days prior to notifying command staff? *****
A. I don't have knowledge of that.
ECF No. 50-1 at 51-53.

sufficient to allow a reasonable jury to infer that those officers were similarly situated to Mr. Verdecchia.

The Court now turns to Mr. Verdecchia's claim related to his taser and IMC policy violations. To illustrate that the taser and IMC policies were selectively enforced against him, Mr. Verdecchia cites the deposition testimony of former Deputy Sheriff Geoffrey Weston and former Division of Sheriffs employee Patrick Keeley. *See* ECF No. 50-3 ¶¶ 89-107. Mr. Weston testified that, in March 2020, he contacted various courthouses and learned that no one in the sheriffs' department followed the taser policy. *Id.* ¶ 89. He also highlighted that it was common knowledge in the department that no one was following such policy. *Id.* ¶ 90. Mr. Weston noted that, in his capacity as union president, he was unaware of any other supervisor charged with a taser policy violation and that Mr. Verdecchia was "singled out." *Id.* ¶ 96.

But Defendants assert that Mr. Weston's deposition testimony does not support the contention that only Mr. Verdecchia was disciplined for taser violations. ECF No. 52 at 25. They underscore that, when asked whether it was possible that he did not have knowledge of each and every disciplinary action for taser violations against other sheriffs, Mr. Weston responded, "That's possible." *Id.* (quoting ECF No. 52-1 at 39). Thus, Defendants contend that, based on that answer, Mr. Weston's "testimony as to Plaintiff being the only one who suffered a disciplinary infraction is not an established fact in the record." *Id.* The Court agrees.

There is also evidence in the record that establishes that, since 2015, thirteen other sheriffs were in fact disciplined for violating the taser policy. *See* ECF No. 50-1 at 213. Mr. Verdecchia does not dispute those disciplinary records; in fact, he cites to them in his Statement of Undisputed Facts to illustrate that other sheriffs received less severe levels of discipline when violating the taser policy. *See* ECF No. 50-3 at ¶ 119. It is true that, of all the sheriffs disciplined for taser policy violations since 2015, Mr. Verdecchia received the most severe discipline—a 15-day suspension. ECF No. 50-1 at 213-14. That said, the 15-day suspension was for violating both the taser policy and the IMC records policy. *See* ECF No. 71 ¶ 20. Thus, the sheriffs that received less discipline for violating only the taser policy are not comparators to Mr. Verdecchia, who was disciplined for violating both the taser policy and IMC records policy.

The same logic applies to Mr. Verdecchia's contention that he was the only one to be disciplined for violating the IMC records policy. To support this contention, he cites Mr. Keeley's deposition testimony, who asserted that he did not know any supervisors that Chief DeCesare disciplined for "neglecting to fix IMC errors." ECF 50-1 at 129-30. But, again, Mr. Verdecchia is not similarly situated to the Division of Sheriffs employees who failed to correct IMC records because Mr. Verdecchia had another infraction aside from the IMC attendance record errors—his taser policy violation.

Finally, the Court addresses Mr. Verdecchia's claims based on his COVID-19 Directive violation. Mr. Verdecchia asserts that Deputy Sheriff Pena and Lieutenant

Karen Dellinger committed the same violation as he did, but were only reprimanded while he was demoted.  ECF No. 1 ¶ 83.  Even so, Mr. Verdecchia has not proffered sufficient evidence illustrating that he is similarly situated to these two other officers. Nothing in the record suggests that Deputy Sherriff Pena and Lieutenant Dellinger had a similar disciplinary history—a demotion and suspension—at the time they were disciplined for the COVID-19 Directive violation.  In fact, no evidence shows that Deputy Sheriff Pena had any disciplinary history and Mr. Verdecchia testified that Lieutenant Dellinger has never been demoted.  ECF No. 50-1 at 53.  Mr. Verdecchia is not similarly situated to other Division of Sheriffs employees because he has not proffered sufficient evidence that the identified employees engaged in conduct of comparable seriousness—the erroneous prisoner release and taser/IMC policy violation incidents—*or* had a similarly poor disciplinary record.  Thus, the Court GRANTS Summary Judgment for Defendants as to the selective enforcement claim.

### ii.  Substantive Due Process Claim

Next, Mr. Verdecchia alleges that Defendants violated his Substantive Due Process rights under the Fourteenth Amendment when they "acted intentionally, willfully, recklessly and/or with discriminatory animus and with deliberate indifference to [his] clearly established constitutionally protected rights."  To set forth such a claim, a plaintiff must prove that "they suffered the deprivation of an established life, liberty, or property interest, *and* that such deprivation occurred through governmental action that shocks the conscience."  *Clark v. Boscher*, 514 F.3d

107, 112 (1st Cir. 2008) (citing *Pagán v. Calderón*, 448 F.3d 16, 32 (1st Cir. 2006)). "Executive acts that shock the conscience must be truly outrageous, uncivilized, and intolerable, and the requisite arbitrariness and caprice must be stunning, evidencing more than humdrum legal error." *Harron v. Town of Franklin*, 660 F.3d 531, 536 (1st Cir. 2011) (citations and quotations omitted). Further, the "hallmark of successful challenges is an extreme lack of proportionality, as the test is primarily concerned with violations of personal rights so severe[,] so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *Id.* (quoting *González–Fuentes v. Molina*, 607 F.3d 864, 881 (1st Cir. 2010)). This standard has been deliberately set high "to protect the Constitution from demotion to merely 'a font of tort law.'" *Cummings v. McIntire*, 271 F.3d 341, 344 (1st Cir. 2001) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).

Here, the constitutionally protected interest that Mr. Verdecchia alleges he was deprived of is his "protected interest in continued employment." ECF No. 50 at 30. The gravamen of Mr. Verdecchia's allegations is that that Chief DeCesare deprived him of such protected interest by treating him differently and selectively enforcing the Division of Sheriffs Rules and Regulations by recommending severe disciplinary sanctions. *See* ECF No. 75 at 6. While some may sympathize with Mr. Verdecchia regarding this alleged disparate treatment, no reasonable juror could conclude that Chief DeCesare engaged in "outrageous, uncivilized, and intolerable"

conduct that shocks the conscience for disciplining him for infractions Mr. Verdecchia does not dispute he committed. Rather, Chief DeCesare's conduct is far less egregious than the conduct present in controlling cases where Substantive Due Process violations were found. *See e.g.*, *Rochin v. California*, 342 U.S. 165, 172 (1952) (obtaining evidence by pumping a defendant's stomach against his will); *Harrington v. Almy*, 977 F.2d 37, 43-44 (1st Cir. 1992) (requiring police officer charged with child abuse to take a highly intrusive physical test of sexual arousal as a condition of reinstatement). Accordingly, the Court GRANTS Defendants' Motion for Summary Judgment as to the Substantive Due Process claims.

### B.    ADEA

Lastly, Mr. Verdecchia brings an ADEA claim against Defendants, alleging that they committed adverse employment actions against him to punish or "force him into early retirement thereby constructively discharging him from employment as a sheriff." But the ADEA claim against Chief DeCesare in his individual capacity fails because there is no individual liability under the ADEA. *See, e.g.*, *Fantini v. Salem State Coll.*, 557 F.3d 22, 28–32 (1st Cir. 2009) (holding that there is no individual liability under Title VII of the Civil Rights Act of 1964 and highlighting the similarity between Title VII and the ADEA's relevant statutory language); *Ventura v. Hanitchak*, 719 F. Supp. 2d 132, 137 (D. Mass. 2010) (holding that the ADEA does not provide for individual liability). Thus, the Court GRANTS Defendant's Motion for Summary Judgment as to Mr. Verdecchia's ADEA claim against Chief DeCesare in his individual capacity.

As to Mr. Verdecchia's ADEA claim against the State, the DOA, and Officer DeCesare in his official capacity, such claims are barred under the Eleventh Amendment of the United States Constitution, which "bars federal suits by citizens against the state or state agencies," *O'Neil v. Baker*, 210 F.3d 41, 47 (1st Cir. 2000), unless there is a "waiver by the State or valid congressional override." *Acevedo López v. Police Dept. of Com. of Puerto Rico*, 247 F.3d 26, 28 (1st Cir. 2001); U.S. Const. amend. XI.  Here, Defendants have not expressly waived their sovereign immunity, raising it as an affirmative defense in their Answer to Mr. Verdecchia's Complaint. *See* ECF No. 11 at 14 ("The State Defendants enjoy the benefit of the State's status as sovereign, together with all privileges and immunities which inure to said sovereign status.").  Further, in *Kimel v. Florida Board of Regents*, the United States Supreme Court held that "in the ADEA, Congress did not validly abrogate the States' sovereign immunity to suits by private individuals."  528 U.S. 62, 91 (2000).  Thus, without express waiver of sovereign immunity or a valid congressional override of such immunity, Mr. Verdecchia's suit for money damages under the ADEA fails as a matter of law.  Accordingly, the Court GRANTS Defendants' Motion for Summary Judgment as to Mr. Verdecchia's ADEA claims against the State, the DOA, and Officer DeCesare in his official capacity.

## IV.    CONCLUSION

For all these reasons, the Court GRANTS Defendants' Motion for Summary Judgment.  ECF No. 70.

IT IS SO ORDERED.


*s/John J. McConnell, Jr.*

_____

JOHN J. MCCONNELL, JR.
Chief Judge
United States District Court

August 27, 2025